COMMERCIAL UNION INSURANCE
COMPANY, Plaintiff,

v.

FLAGSHIP MARINE SERVICES, INC.
d/b/a Sea Tow Services of Lee
County, Defendant.

No. 95 Civ. 0496 (JSR).

United States District Court,
S.D. New York.

Nov. 14, 1997.

David R. Hornig, Julia Moore, Nicoletti Hornig & Sweeney, New York, NY, for Plaintiff.

Steven G. Schwartz, Mattlin & McClosky, Boca Raton, FL, for Defendant.

## OPINION AND ORDER

RAKOFF, District Judge.

After one of its employees was injured aboard ship in November, 1994, defendant Flagship Marine Services, Inc. d/b/a Sea Tow Services of Lee County ("Flagship") sought to recover from its insurer, plaintiff Commercial Union Insurance Company—and wound up with a lawsuit instead. Specifically, in January, 1995, Commercial Union com-

menced this action against Flagship seeking a declaratory judgment that Flagship was barred from recovery because Flagship had breached a warranty in its insurance policy with Commercial Union and/or because the insurance policy had been void from the start as a result of Flagship's alleged failure to provide full disclosure of the scope of Flagship's operations. Flagship, in turn, counterclaimed against Commercial Union, alleging breach of contract, breach of the duty to defend, bad faith insurance handling under Florida law, wrongful rescission, and need for reformation.

Discovery was closed and cross motions for summary judgment were pending when the case was transferred to this Judge on February 26, 1997. On March 24, 1997, after hearing oral argument, the Court denied all summary judgment motions but made certain findings pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. *See* March 24, 1997 Transcript. There followed a four day bench trial, June 10 through June 13, 1997, and submission of post-trial memoranda.

Upon a consideration of the evidence submitted at trial, the post-trial memoranda, and all other prior papers and proceedings herein, the Court now denies Commercial Union's claims for declaratory judgment, grants Flagship's claims for breach of contract and breach of the duty to defend, and denies Flagship's remaining claims. The findings of fact and conclusions of law supporting these rulings herewith follow.

### Factual Findings

Flagship is one of about seventy affiliated companies licensed by Sea Tow International to operate under the "Sea Tow" trademark. Trial Transcript ("Tr.") at 745. In exchange for an annual fee, Sea Tow subscribers receive emergency marine assistance, such as towing, refueling, recharging batteries, and ungrounding grounded vessels. Tr. 234, 744–46. Only operators of non-commercial pleasure craft qualify for regular membership, but Sea Tow licensees sometimes provide *ad hoc* emergency services to non-members, such as operators of commercial vessels, for fees set by the particular circumstances. Tr. 234, 746–47. Separate from these emergency services, most Sea Tow licensees, including Flagship, are also in the business of providing non-emergency services to commercial vessels, including towing, oil spill clean-up, salvage work, and commercial diving. Tr. 176, 237, 327; *see also infra.*

Prior to 1994, the Sea Tow companies were insured under a master insurance policy from the New Hampshire Insurance Group, which named Sea Tow International as the primary insured and each Sea Tow licensee as a named insured. Tr. 160–61. The policy had been placed by Daniel Brisotti, the president of an insurance brokerage company named Brisotti & Silkworth ("B & S"). *Id.* In or about June 1994, New Hampshire Insurance Group informed Brisotti that it would not renew the master policy, whereupon Brisotti began to seek alternative coverage for Sea Tow International and its licensees. Tr. 162, 204, 226, 228. Among the insurers he contacted was Commercial Union, with which B & S had (and continues to have) a written "Marine Agency Agreement" drafted by Commercial Union. Among other things, the Agreement authorizes B & S, as Commercial Union's agent for these purposes, to place commercial and yacht business with Commercial Union's marine department and, with prior approval from Commercial Union, to sign the "binder" on the policies and execute certificates of insurance on behalf of Commercial Union. Tr. 164–65, 203, 221, 224–25, 231, 632, 654; Trial Exhibit ("Ex.") 23. The Agreement does not, however, give B & S any authority to cancel or amend the terms and conditions of any such policy, waive any exclusion, or set any premium. Tr. 163–64, 229, 632–33; Ex. 23.

Most of Brisotti's discussions with Commercial Union regarding the Sea Tow policies were with Michael Schliwka, a Commercial Union marine underwriter. Instead of offering Brisotti a master policy, Schliwka proposed that each Sea Tow licensee be insured separately. Tr. 166–168, 256, 432, 435, 488. Accordingly, Schliwka asked Brisotti to submit separate applications for each Sea Tow licensee on two-page forms entitled "Application for Quotation" drafted by Commercial Union. *Id.* Brisotti, in turn, filled out these forms for each of the various Sea Tow

companies, including Flagship. Tr. 180, 438; Exs. C, D and 25.

Within a section entitled "General Description of Operation," the form provided a single line for "the type of work employed in." On Flagship's form (as on others) Brisotti filled in this line with the words "Tow Boat—Pleasure Craft." Ex. D. Brisotti, however, never sent the filled-in form to Flagship for review, allegedly because he was under "time constraints" to obtain the replacement insurance before the New Hampshire Insurance Group coverage expired on September 15, 1994. Tr. 182–83, 268–71. Flagship, therefore, never signed the line provided under the statement that ". . . it is agreed that this form shall be the basis of the contract should a policy issue." Ex. D. Nevertheless, Commercial Union accepted the unsigned application.

The application form was not the only information concerning the operations of Flagship and other Sea Tow licensees that Schliwka received from Brisotti in the course of the application process. To begin with, Brisotti provided Commercial Union with a copy of the expiring insurance policy and rate information relating thereto, and, for each of the Sea Tow licensees (including Flagship), a full list of vessels, a complete loss listing from April 1992 through June 1994 and a summary of general loss listing, resumes of the captains, a list of vessel minimum requirements, certificates for certain captains indicating that they were accredited for commercial assistance and professional towing, and detailed vessel surveys. Tr. 248–50, 279–80, 440; see, e.g., Exs. 47, 75 and A. In addition, the policies subsequently issued were expressly conditioned upon receipt of substantial additional documentation, which was timely provided. Tr. 265, 277, 440, 442, 495–97.

Upon careful inspection, the Court finds that documents provided to Commercial Union in the application process fully disclosed the involvement of Flagship and other Sea Tow licensees in oil spill and other pollution clean-up work, emergency salvage operations, search and rescue operations, commercial diving operations, towing of large commercial vessels, and numerous other aspects of Flagship's business that defendant alleges were undisclosed. See, e.g., Exs. A, B, 15A, 28, 47, 70; Tr. 258, 437, 466, 472, 489–90, 534, 567. In addition, although the Court discredits Brisotti's self-serving testimony that Schliwka rebuffed Brisotti's oral efforts to apprise Schliwka of the full scope of the Sea Tow business, see Tr. 266, 449–50, 490, the Court nonetheless finds that Schliwka was personally familiar with the broad scope of Sea Tow's business as a result of his past prior involvement with the company. Tr. 226, 449 ff., 490.

The policies that Commercial Union issued to each of the various Sea Tow licensees were substantially identical. Tr. 158, 277–79. On September 8, 1994, Commercial Union issued policy number CJH421082 (the "Policy") to Flagship, Tr. 188, 277; Ex. G. Coverage, for a period of one year, became effective on September 15, 1994. Joint Pretrial Order, Stipulated Facts Nos. 1 and 2; Ex. I. The complete policy was mailed to Flagship on November 9, 1994. Tr. 357, 359; Exs. 36A and 151.

On November 13, 1994, Gary MacLean, captain of one of Flagship's insured vessels, SEATOW No. 6, was injured in the course of towing the LANTERN QUEEN, a 61–foot long commercial dinner cruise vessel. Stipulated Facts Nos. 6 and 7. Specifically, MacLean was injured when a towline connecting SEATOW No. 6 to the LANTERN QUEEN became tangled around his leg, causing him to be pulled overboard. Stipulated Fact Nos. 4 and 8.

On December 5, 1994, Brisotti submitted to Commercial Union Flagship's notice-of-loss claim for the MacLean accident. Exs. 29, M. On December 22, 1994, Commercial Union declined coverage, citing an exclusion in the policy that precluded coverage for the towing of "yachts" larger than 50 feet. Ex. I, P. In June, 1995, Commercial Union communicated to Sea Tow International its intention not to renew any of the Sea Tow licensees' policies upon their expiration in September, 1995. Tr. 587, 644, 658, 666. On August 23, 1995, Commercial Union informed Flagship that it was declaring Flagship's policy void from inception on the basis of material misrepresentations concerning the scope

of Flagship's operations in oil spill clean-up, salvage work, towing of commercial vessels, and search and rescue operations. Tr. 588–89; Ex. Q. Commercial Union did not seek to rescind any of the other individual Sea Tow licensees' policies. Tr. 587, 644, 658, 666.

On January 23, 1995, Commercial Union commenced this lawsuit. On March 24, 1997, this Court found as a matter of law that the exclusion of coverage for towage of yachts larger than 50 feet did not apply to towage of commercial vessels such as the LANTERN QUEEN. *See* March 24, 1997 Transcript at 37–38. The Court further found, however, that material issues of fact remained as to Commercial Union's contention that Flagship's policy was void *ab initio* because of material misrepresentations, as well as to Flagship's counterclaims. A bench trial followed.

### Legal Conclusions

The seemingly anachronistic doctrine of *uberrimae fidei* still governs every marine insurance contract. *See Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 870 (2d Cir.1985); *In re Balfour MacLaine Intern., Ltd.*, 85 F.3d 68, 80 (2d Cir.1996). "Insurance companies, which on occasion really prefer not to pay a claim, embrace that Latinate doctrine with all the liturgical fervor of the *Kyrie Eleison.*" Hon. Charles S. Haight, Jr., *Babel Afloat: Some Reflections on Uniformity in Maritime Law*, 28 J. Mar. L. & Com. 189, 199 (1997). The reason is not hard to discern, since the doctrine puts the burden on the assured to "disclose to the insurer all known circumstances that materially affect the risk being insured"—whether or not the insurer asks about them—on the theory that "[s]ince the assured is in the best position to know of any circumstances material to the risk, he must reveal those facts to the underwriter, rather than wait for the underwriter to inquire." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The assured's failure to make such disclosure entitles the underwriter to void the policy *ab initio. Id.*

Applying these principles, Commercial Union claims that Flagship's alleged failure to disclose that its business operations were not limited to the towing of pleasure crafts, as stated in the application, but also included towage of large commercial vehicles, emergency salvage operations, commercial diving operations, oil spill clean-up, and search and rescue operations, renders the Flagship policy void. As already indicated, however, the Court finds, based on the credible trial evidence and reasonable inferences drawn therefrom, that the full scope of Flagship's business was, in fact, disclosed to Commercial Union. Indeed, the combination of Schliwka's prior knowledge of Sea Tow's operations and the extensive documentation provided by Sea Tow's licensees as part of the application process placed Commercial Union on reasonable notice of every aspect of Flagship's business as to which it here contends it lacked knowledge.

Nowhere is this more evident than with respect to the very risk involved in the accident that gave rise to this litigation, *i.e.,* the towage of commercial vessels. Thus, the ship survey provided to Commercial Union by Flagship (as part of the application process) for SEATOW No. 6, the Flagship vessel involved in the MacLean accident, stated that the vessel, although built for heavy duty bridge construction for the U.S. Army, was "readily adaptable to Towing and Distress/Salvage operations." Ex. 15A. Since no one imagined that Flagship would be using the vessel for bridge construction, the only natural inference was that that vessel was going to be used for towing, distress and salvage activities.

Likewise, surveys for the other Flagship vessels clearly notified Commercial Union that Flagship's vessels were intended for a broader range of operations than towing pleasure craft. For example, the survey for Flagship's vessel SEMPER PARATUS stated "[t]his vessel was designed and built as a working tow boat/salvage/rescue vessel and works in that capacity each work day." Ex. 15A; Tr. 523. The survey for Flagship's vessel POPEYE described the model of the vessel as "Commercial Tow/Rescue" and stated "Being a rescue vessel, the safety-at-sea inventory was very large." Ex. 15A. The survey for Flagship's vessel SEA TOW No. 2 indicated that the use for the vessel was

"Commercial Towing/Salvage" and stated that "this vessel [is] very well equipped to perform the duties of a Tow or Salvage/Rescue boat." Ex. 15A; Tr. 533. The survey for Flagship's vessel REEFE HOOKER indicated that the vessel's intended use was "Commercial towing/salvage/rescue" and stated that "This vessel was converted to a towing/salvage/rescue vessel ... [which] has proven very successful as this vessel has lended itself admirably to the commercial application." Ex. 15A.

■ Commercial Union's remarkable claim that, having expressly requested these surveys, Tr. 180, 438–441, it failed to read them, Tr. 441, 468, 509, 551, holds no water. "The assured complies with the rule [of *uberrimae fidei*] if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter requires further information, he can ask for it." *Puritan*, 779 F.2d at 871. *See Knight*, 804 F.2d at 13; *Contractors Realty Co., Inc. v. Ins. Co. of North America*, 469 F.Supp. 1287 (S.D.N.Y.1979). Commercial Union had its own good faith duty to read what it had requested, especially when the insurance coverage for the individual licensees was expressly made subject to their provision of such requested documents, Tr. 495–96. *See also Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.*, 944 F.Supp. 986, 1003 (D.Mass.1996) ("The duty of *uberrimae fidei* is a reciprocal one"); *Royal Ins. Co. of America v. Cathy Daniels, Ltd.*, 684 F.Supp. 786, 792 (S.D.N.Y.1988). Nor did Commercial Union's own witnesses deny their obligation to read these materials and take such information into consideration in issuing their policies. *See* Tr. 124–26, 441, 467–69, 509–510, 527, 656.

Furthermore, even if one were to assume, contrary to fact, that aspects of Flagship's business were not adequately disclosed to Commercial Union, it is clear that Commercial Union did not regard such aspects as material to its determination of whether or not to issue the Flagship policy. Thus, Commercial Union, having learned by no later than August 1, 1995 that most if not all of the Sea Tow licensees were engaged in oil spill clean-up, salvage work, towage of commercial vessels, search and rescue operations, and commercial diving, chose to void the insurance policy of only the one licensee, Flagship, that had made a substantial claim, and otherwise continued the Sea Tow policies in full force (as well as renewing its agency agreement with B & S). Tr. 176, 237, 327, 477, 491–92, 588, 646, 655, 659, 677; Ex. B, Q. Nor does the fact that Commercial Union decided not to renew the Sea Tow policies change the analysis, since the decision not to renew the policies was made in June 1995, well before the August 1, 1995 deposition at which Commercial Union claims to have first learned the full scope of Flagship's business activities. Tr. 587, 644, 658, 666; Ex. Q.

For the foregoing reasons, and having considered all additional points raised by counsel in their post-trial memoranda, the Court hereby dismisses Commercial Union's claim, and, instead, awards judgment to Flagship on its counterclaims for breach of contract and duty to defend. *See Avondale Industries, Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1204 (2d Cir.1989); *Burroughs Wellcome Co. v. Commercial Union Ins. Co.*, 632 F.Supp. 1213, 1218 (S.D.N.Y.1986). Given those determinations, Flagship's further counterclaim for reformation of contract is denied as moot.

The Court also denies Flagship's counterclaims for bad faith insurance handling in violation of Florida law and for wrongful rescission. As to the former, even assuming *arguendo* Florida law were applicable, Flagship's counterclaim is facially deficient in that Flagship has utterly failed to prove, or even allege, that it satisfied the condition precedent for actions brought pursuant to the relevant provisions of that law, *i.e.*, 60 day's written notice of the violation to the insurer. West's F.S.A. § 624.155(2)(a). As to the latter, the record is devoid of sufficient showing to warrant the Court in finding that Commercial Union's breach of its obligations under the policy was done "wilfully and without justification" so as to support a wrongful rescission claim. *See Samovar of Russia Jewelry Antique Corp. v. Generali*, 102 A.D.2d 279, 476 N.Y.S.2d 869, 871 (1st Dep't 1984); *see also Alden Coal Mining Co., Inc.*

*v. C.L. Amos Coal Co.,* 171 N.Y.S. 980 (Sup. Ct. N.Y. County 1918).

In light of these determinations, the parties are directed to jointly telephone Chambers on November 24, 1997 at 6:00 p.m. to schedule any remaining proceedings relating to this case, as well as in the related cases of *Commercial Union v. Flagship,* No. 97 Civ. 3943, and *Commercial Union v. Flagship, et al.,* No. 97 Civ. 4552.

SO ORDERED.