**SEALINK, INC., Plaintiff,**

v.

**FRENKEL & CO., Inc., Defendant.**

**Civil No. 04–1709 (DRD).**

United States District Court,
D. Puerto Rico.

July 31, 2006.

Ronald L. Rosenbaum, Ronald L. Rosenbaum Law Office, San Juan, PR, for Plaintiff.

Eric Perez–Ochoa, Fernandez & Perez–Ochoa, LLP, San Juan, PR, for Defendant.

## OPINION AND ORDER

DOMÍNGUEZ, District Judge.

Plaintiff Sealink, Inc. (hereinafter "Sealink") filed the instant complaint pursuant to this Court's jurisdiction under 28 U.S.C. sec. 1332. *See* Docket Nos. 1 & 3. Sealink requests damages for the denial of coverage and the voidance of an insurance policy placed by the defendant and lost business opportunities. *Id.*, at ¶¶ 21–24. Defendant Frenkel & Co., Inc. (hereinafter "Frenkel"), filed a motion for summary judgment alleging three main issues. *See* Docket No. 19. First, Frenkel contends that Sealink's action was time barred by the statute of limitations applicable to tort actions. *Id.*, at p. 26. Second, Frenkel purports that Sealink's allegation of Frenkel's breach of fiduciary duty is without merit. *Id.*, at p. 31. Lastly, defendant argues that its alleged negligence was not the proximate cause of Sealink's injuries stemming from the voidance of its insurance policy. *Id.*, at p. 36. On March 27, 2006, Sealink filed an opposition to Frenkel's motion for summary judgment. *See* Docket No. 27. Therein, Sealink avers that Frenkel failed to act with the sufficient skill, care, and diligence required of

an insurance broker. *Id.*, at p. 1. Sealink also alleges its claim is not time barred because the applicable statute of limitations began to run at the time a court of competent jurisdiction advised it of defendant's obligation with respect to the policy. Plaintiff proposes the statute of limitations began to run on February 12, 2003, date in which the Court of First Instance of the Commonwealth of Puerto Rico issued its *Judgment* dismissing the state action between the Economic Development Bank and the parties to the instant case. Plaintiff also alleges tolling of the statute of limitations *Id.*, at p. 12–13.

On April 21, 2006, the Court referred the matter to Honorable Magistrate Judge Gustavo A. Gelpí for his Report and Recommendation (hereinafter "R & R") pursuant to 28 U.S.C. § 636(b)(1)(B); FED. R.CIV.P. 72(b); and L.CIV.R. 72.1(b). (Docket No. 37 regarding Docket Nos. 19 & 34). The Magistrate Judge filed his R & R on May 11, 2006. (Docket No. 40). In his report, the Magistrate Judge recommends that the motion for summary judge-

ment be granted based on the running of the statute of limitations.[1] Sealink filed their objection thereto on May 22, 2006 within the time period allowed by the Court. (Docket No. 41). Frenkel filed a response in opposition to Sealink's objection on May 31, 2006. (Docket No. 42).

After considering both parties' objections, and reviewing *de novo* the R & R, the Court concludes that Frenkel's motion for summary judgment should be GRANTED.

## I

### MAGISTRATE REPORT AND RECOMMENDATION

The District Court may refer dispositive motions to a United States Magistrate Judge for an R & R. 28 U.S.C. § 636(b)(1)(B) (1993); FED. R. CIV. P. 72(b); L. CIV. R. 72.1(b). *See Mathews v. Weber*, 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). An adversely affected party may contest the Magistrate's report

---

1. In its opposition to the request for brevis disposition, Sealing requested in the alternative that it be allowed to amend the complaint in order to include a breach of contract claim, thereby, attempting to induce the Court to apply the fifteen (15) year statute of limitations for breach of contract claims. As the Magistrate adequately reasoned, "[a]lmost two years have passed since this action was commence in July 2004. Sealink has had ample time to amend its complaint to include a breach of contract claim. It has not, and only now, in defending a motion for summary judgment, makes this request of the court. The court cannot accept this request. Furthermore, the court cannot ignore what is clearly pled in the complaint [and the amended complaint at docket no. 3]—an action based on negligence not one based on contract or the breach thereof." This Court fully agrees with the Magistrate's conclusion, further finds that the request was made in undue delay (almost two years after the filing of the case) in bad faith in order to forestall the dispositive motion pending, **DENIES**, in the

alternative, Sealink's request to file a second amended complaint, and analyzes the time-barred issue on the basis of the tort claim and a year and a half after the first amended complaint (Amended Complaint filed on 7/13/2004—new amendment set forth in opposition to summary judgment request on 3/27/2006). *See Executive Leasing Corp. v. Banco Popular de Puerto Rico*, 48 F.3d 66, 70 (1st Cir.1995) (citing *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)) ("[L]eave to amend pleadings 'shall be freely given when justice so requires.' Absent factors such as undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, or 'futility of amendment,' the leave sought should be granted.").

The Court further finds the amendment futile because the broker can not be held responsible for misrepresentations/omission made by the insured to the insurer in providing material facts to the insurance company all within the control of the insured. (See discussion *infra*.)

and recommendation by filing its objections within ten (10) days after being served a copy thereof. *See* L. CIV. R. 72.2(a)-(b); FED. R. CIV. P. 72(b). Moreover, 28 U.S.C. § 636(b)(1), where pertinent, provides that:

> Within ten days of being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.

*See* 28 U.S.C. § 636(b)(1).

Provided that both parties have objected the conclusions reached by the Magistrate Judge, the Court shall make a *de novo* review of the R & R.

## II

### SUMMARY JUDGMENT STANDARD AND LOCAL RULE 56

The framework of Fed.R.Civ.P. 56 provides that it is appropriate to enter summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *Abbadessa v. Moore Business Forms, Inc.,* 987 F.2d 18, 22 (1st Cir.1993). Pursuant to the language of the rule, the moving party bears the twofold burden of showing that there is "no genuine issue as to any material facts," *and* that he is "entitled to judgment as a matter of law." *Vega–Rodriguez v. Puerto Rico Tel. Co.,* 110 F.3d 174, 178 (1st Cir.1997). When the moving party asserts that the competent evidence clearly demonstrates that it is entitled to judgment and after the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." *Cortes–Irizarry v. Corporacion Insular,* 111 F.3d 184, 187 (1st Cir.1997).

To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trial worthy issue as to any material fact. *See Perez v. Volvo Car Corporation,* 247 F.3d 303, 310 (1st Cir.2001); *Grant's Dairy–Maine, LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.,* 232 F.3d 8, 14 (1st Cir.2000); *Cortes–Irizarry v. Corporacion Insular,* 111 F.3d 184, 187; *McIntosh v. Antonino,* 71 F.3d 29, 33 (1st Cir.1995) (the Court must look behind the facade of the pleadings alleged in the complaint, in this case the *Third Amended Complaint* (Docket No. 59) and examine the parties proof in order to determine whether a trial is required.). Furthermore, a fact is "material" if it potentially could affect the suit's outcome. *See Id.* An issue concerning such a fact is "genuine" if a reasonable fact finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor. *See Id.* The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).

This is so, because credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *See Reeves, id.* Furthermore,

there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood[.]" *Greenburg v. Puerto Rico Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987). "The Court should give credence to the evidence favoring the non-movant as well as the evidence supporting the moving party that is contradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Id.* Issues of motive are usually not appropriate when in summary judgment for these are questions better suited to be resolved by the trier of facts. *See Pullman–Standard v. Swint*, 456 U.S. 273, 288–90, 102 S.Ct. 1781, 1790–91, 72 L.Ed.2d 66 (1982); *Lipsett v. University of P.R.*, 864 F.2d 881, 895 (1st Cir.1988); *Dominguez–Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir.2000); *see also Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 95 (1st Cir.1996); *Mulero–Rodriguez v. Ponte Inc.*, 98 F.3d 670, 677 (1st Cir.1996); *Stoutt v. Banco Popular de P.R.*, 158 F.Supp.2d 167, 172 (D.P.R.2001).

An absence of evidence on a critical issue weighs against the party—be it the movant or the non-movant—who would bear the burden of proof on that issue at trial. *See Perez v. Volvo Corporation*, 247 F.3d at 310; *see also Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35–36 (1st Cir.1998); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990). Accordingly, "speculation and surmise, even when coupled with effervescent optimism that something definite will materialize further down the line, are impuissant on the face of a properly documented summary judgment motion." *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d at 95.

At the summary judgment stage, the trial court examines the entire record "in the light most flattering to the non-movant and indulges all reasonable inferences in that party's favor. Only if the record, viewed in the manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." *Cadle Company v. Hayes*, 116 F.3d 957 at 959–60 (1st Cir.1997). In other words, the court must construe the record and all reasonable inferences from it in favor of the non-movant (the party opposing the summary judgment motion). *See Suarez v. Pueblo Int'l, Inc.* 229 F.3d 49, 53 (1st Cir.2000); *Cortes–Irizarry*, 111 F.3d at 187; *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Moreover, "[i]f the adverse party does not [file an opposition], summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e) (emphasis added). The First Circuit Court of Appeals has made clear that failure to timely oppose a motion for summary judgment, does not, in itself, justify entry of summary judgment against the party; therefore, a District Court is nonetheless "obliged to consider the motion on the merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate." *Kelly v. United States*, 924 F.2d 355, 358 (1st Cir.1991); *see also Lopez v. Corporacion Azucarera de Puerto Rico*, 938 F2d 1510, 1517 (1st Cir.1991) (holding that before granting an unopposed summary judgment motion, the court must inquire whether the moving party has met its burden to demonstrate undisputed facts entitling it to summary judgment as a matter of law). In the case of failure to oppose a motion for summary judgment, the consequence "is that the party may lose the right to file an opposition." *Mullen v. St. Paul Fire & Marine Ins. Co.*, 972 F.2d 446, 451–52 (1st Cir.1991) (discussing unopposed motion for summary judgment). Notwithstanding, a party that fails to op-

pose a motion for summary judgment, does so at its own risk and peril. *See e.g. Corrada Betances v. Sea–Land Service, Inc.*, 248 F.3d 40, 43 (1st Cir.2001); *Hebert v. Wicklund*, 744 F.2d 218, 223 (1st Cir.1984). However, even though that there is no opposition on file to a summary judgement, the Court must entertain the motion on the merits and may not grant the same as a sanction to the party who fails to oppose. *See De La Vega v. San Juan Star*, 377 F.3d 111(1st Cir.2004).

In the present case, Frenkel moved to strike Docket No. 24—Sealink's document titled "Plaintiff's Statement of Genuine Material Issues of Fact". *See* Docket No. 34. Notwithstanding, on the same day that Docket No. 24 was filed, Sealink also submitted two documents titled "Plaintiff's Designation of Uncontested Facts" and "Plaintiff's Objections to Defendant's Statement of Undisputed Facts" with accompanying exhibits. *See* Docket Nos. 25 and 26. By filing Docket Nos. 25 and 26, Sealink more than adequately complied with the L.Civ.R. 56. Therefore, Frenkel's motion to strike is found **MOOT**. The Court notes that Frenkel complied with the L. CIV. R. 56.

### III

### FACTUAL AND PROCEDURAL BACKGROUND

After reviewing Magistrate–Judge Gustavo A. Gelpí's factual and procedural background included in his R & R, Docket No. 40, p. 2, and deeming it complete, the Court now transcribes it herein *verbatim* with a minor adjustments.

On July 7, 2004, Sealink filed the present action alleging that Frenkel was negligent to Sealink, *inter alia*, by misrepresenting past casualties associated with Sealink's vessel, and by failing to properly explain and advise it of the terms and conditions of Sealink's insurance policies. *See* Docket No. 1. Sealink alleges that, as a result of Frenkel's negligence, Sealink's insurer denied coverage on its insurance policies and Sealink lost business opportunities. *Id.* After several months of discovery, Frenkel filed its motion for summary judgment. *See* Docket No. 19. Frenkel argues that Sealink's action is time-barred given that the case is one in tort subject to a one-year statute of limitations. *Id.* Sealink opposed the motion arguing that the statute of limitations was tolled because the suit was filed after they had knowledge of who had injured them, a requisite under Puerto Rico law. *See* Docket No. 27.

The following facts are undisputed. Sealink is a corporation organized and existing under the laws of Puerto Rico, and engaged in the business of maritime cargo carriage in and about the Caribbean Basin. *See* Docket No. 20, ¶ 1. Sealink is the owner of a cargo vessel known as the M/V Sealink Express. *Id.*, at ¶ 3. Frenkel is an international insurance brokerage firm, which provides businesses and individuals with insurance and risk management services. *Id.*, at ¶ 5. Frenkel procures insurance policies for marine exposures, property, and casualty. *Id.*

In providing its services, Frenkel obtains information directly from the client pertinent to their businesses and related risks, and then procures what it believes should be proper insurance to protect the assets. *Id.*, at ¶ 8. On November 12, 1997, Sealink sought out Frenkel's services and filled out a "London Market Protection and Indemnity Insurance Application Form." *Id.*, at ¶ 9. The application was completed almost entirely by Kristian Meszaros, Sealink's President and Chief Executive Officer, on Sealink's behalf. *Id.*, at ¶ 10. By signing the application, Meszaros warranted that the information provided was "complete

and accurate", and acknowledged that underwriters would rely on the information and representations listed therein in determining acceptability, rates, and conditions of coverage. *Id.*, at ¶ 11. By signing the application, Sealink also understood that any misrepresentation or omission would constitute "ground for immediate cancellation of coverage and denial of claims." *Id.*, at ¶ 12. Further, by signing the application, Sealink noted and acknowledged that it was "under a continuing obligation" to notify underwriters of any material alteration to the "nature, extent or size" of the operation. *Id.*, at ¶ 13. Meszaros reviewed the application after completing it, to make sure it was accurate, and sent it to Joseph Valenza, Frenkel's representative. *Id.*, at ¶ 14; Docket No. 25, ¶ 1. Frenkel did not review the application to determine if the responses were correct, but only to ascertain it was signed. *See* Docket No. 20, ¶¶ 15 & 16.

During 1997 and 1998, Frenkel, through Valenza, procured two insurance policies for Sealink. *See* Docket No. 25, ¶ 8. One policy was for Protection and Indemnity (hereinafter "P & I") coverage through a British company, Terra Nova; the other for Hull & Machinery (hereinafter "H & M") coverage through an American company, St. Paul Fire and Marine. *Id.* The H & M policy that expired in 1998 was not renewed in 1999 due to Sealink's "severe cash problems." *See* Docket No. 20, ¶ 21. In late 1999, Frenkel procured a new H & M policy for Sealink. *Id.*, at ¶ 23. From January to February 2000, Valenza received several lead quotations from various entities for the requested H & M coverage and corresponded with Meszaros on the subject. *Id.*, at ¶ 30. While procuring H & M coverage, Frenkel also procured new P & I coverage for Sealink. *Id.*, at ¶ 32. Sealink's P & I policy was approved and renewed on February

5, 2000 for one year. *Id.*, at ¶ 33. The P & I policy was issued by Terra Nova. *Id.* at ¶ 34. The P & I policy accepted and approved by Sealink contained and [sic] arbitration and selection clause. *Id.*, at ¶¶ 34 & 35. Specifically, the clause read "[a]ny dispute arising under or in connection with this Insurance is to be referred to arbitration on London [. . .]". *Id.* Meszaros was aware that the P & I policy contained the provision requiring arbitration in London. *See* Docket No. 20, ¶ 36; Docket No. 26, ¶ 36. On February 22, 2000, Sealink advised Frenkel that it had forwarded the proposed H & M coverage to the Economic Development Bank of Puerto Rico (hereinafter "EDB"), as secured creditor of Sealink and co-assured, for their comments. *See* Docket No. 20, ¶ 38. Sealink notes that the policy [Frenkel] forwarded failed to include a "MAR 91—Slip Copy" nor made any mention of a forum selection clause. *See* Docket No. 26, ¶ 38.

The EDB requested that the valuation of the vessel be increased to $4 million. *See* Docket No. 20, ¶ 39. As a result, Sealink requested Frenkel to cause the issuance of H & M policies as follows: 1) H & M coverage at $3.2 million, and 2) Increased Valuation (hereinafter "IV") at $800,000. *Id.*, at ¶ 40. On February 29, 2000, Frenkel received confirmation that coverage had been bound by both H & M and IV underwriters, Lloyd's of London. *Id.*, at ¶ 42.

On April 23, 2000, a fire was reported aboard the Sealink Express in the engine room. *Id.*, at ¶ 54. The fire occurred at dockside in the Dominican Republic while the Sealink Express was being repaired for previous flood damages not claimed in the instant case. *Id.*, at ¶ 3. The fire was contained by the local Dominican fire crew. *Id.*, at ¶ 54. On that same day, Meszaros informed

Frenkel of the casualty by phone and fax. *Id.*, at ¶ 55. Shortly after the fire, Sealink filed a claim with the H & M underwriter, Lloyd's of London, seeking payment of the policy amounts. *Id.*, at ¶ 56. On April 26, 2000, as a result of Frenkel's notice to the insurer, Capt. D. Weston, a marine and cargo surveyor of Schad Insurance in the Dominican Republic, was appointed to act on behalf of the H & M underwriter. *Id.*, at ¶ 57. Capt. Weston was appointed by Frenkel and entrusted with performing a survey/ investigation surrounding the case, nature, and extent of damages incurred by the vessel. *Id.*, at ¶ 58. Capt. Weston's initial investigation suggested possible foul play by ex-crew of the Sealink Express. *Id.*, at ¶ 59. On June 30, 2000, Weston rendered another report suggesting that, considering the cost of repairs, the underwriters may wish to consider the vessel a constructive total loss.[2] *Id.*, at ¶ 60. On July 6, 2000, as a result of this casualty, and based on Sealink's opinion that the cost of repairs of the vessel would exceed the insurance value, the Sealink Express was declared a constructive total loss and a Notice of Abandonment of the vessel to the underwriters was issued. *Id.*, at ¶ 61.

On December 29, 2000, Sealink requested from Frenkel copies of the Cover Notes of the policies, the complete policies, and a breakdown of the Lloyd's of London syndicates for the H & M and P & I policies. *Id.*, at ¶ 62. Sealink asserts that Meszaros requested this information because it had not been previously provided to him. *See* Docket No. 26, ¶ 62.

On or about January of 2001, Sealink first learned what "MAR 91—Slip Copy" [3] meant when counsel for the H & M underwriter advised that they would possibly avoid insurance, and that arbitration was mandated. *See* Docket No. 20, ¶ 65. The document containing the MAR 91 clause confirms that the insurance "shall be subject to the exclusive jurisdiction of the English Courts, except as may be expressly provided herein to the contrary." *Id.*, at ¶ 69. **[It is this specific clause that gives rise to Sealink's claim that the broker was not diligent, and thus, liable.]** On February 27, 2001, Frenkel sent Sealink a letter, from the H & M underwriter's counsel advising that Lloyd's of London had formally denied the claim under the H & M policy due to "serious misrepresentations, material non-disclosures and the breach of the utmost duty of good faith by Sealink". *Id.*, at ¶ 72; Docket No. 26, ¶ 72.

On June 8, 2000, the EDB, as secured creditor and co-assured, brought suit against Sealink. *See* Docket No. 20, ¶ 75. The EDB sued Sealink, Meszaros and the Lloyd's of London underwriters

---

**2.** A constructive total loss is when the cost of repairing the damage sustained in a vessel exceeds the insurance value. 12 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 183–10 (1997).

**3.** The term MAR 91 has its origins in London, England. The Marine Insurance Act was passed in England in the year 1906, which codified the previous common law related to insurance matters. In the 19th century, Lloyd's and the Institute of London Underwriters developed between them standardized clauses for the use of marine insurance, which are known as the Institute Clauses. The Marine Insurance Act includes a standard policy, which parties were at liberty to use if they wished, but they were expressed in archaic terms. In 1991, the London market produced a new standard policy wording known as the MAR 91 form. The MAR form is a general statement of insurance; the Institute Clauses are used to set out the detail of the insurance coverage. In practice, the policy document usually consists of the MAR form used as a cover, with the Clauses stapled to the inside.

seeking to collect amounts due under the loan agreement. *Id.*, at ¶ 76. On February 12, 2003, the Superior Court of Puerto Rico, in Carolina, rendered judgment and stated: "[f]rom the materials submitted in support for the arguments of the parties it does not appear that the insured [. . .] had ever raised a question or concern [. . .]". *See* Docket No. 26, ¶ 79. The [State Superior C]ourt dismissed the claims against the underwriters. *See* Docket No. 20, ¶ 79. The Superior Court also noted that it could not ignore that Sealink had delegated certain responsibilities onto Frenkel as its broker [and that Sealink had ample opportunity to inquire as to the terms and conditions of this new policy]. *See* Docket No. 19, Exhibit 32, p. 13–14. Nonetheless, the Court imputed onto Sealink the knowledge of the terms and conditions negotiated on its behalf by persons with knowledge of what is being negotiated. *Id.*, Exhibit 32, p. 17.

On October 22, 2001, legal proceedings were initiated by Sealink before the United States District Court in Puerto Rico against the Lloyd's H & M and IV underwriters seeking to collect the value of the policies. *See* Docket No. 20, ¶ 81. Sealink did not join Frenkel as a defendant in this lawsuit. *Id.*, at ¶ 82. On October 24, 2003, the Court dismissed the complaint by upholding the forum selection clause incorporated in "MAR 91—Slip Policy." *Id.*, at ¶ 83.

In early 2002, H & M underwriters, Lloyd's of London, also commenced arbitration proceedings against Sealink and EDB seeking avoidance of the H & M policy and breach of contract damages. *Id.*, at ¶ 85. The parties settled for $25,000.00, agreeing that such payment completely discharged and released the H & M and IV underwriters from any liability with respect to the premium and all liability arising out for the H & M and IV policies. *See* Docket Nos. 26, ¶ 87 & 20, ¶ 88.

On July 15, 2003, two years and five months after the H & M underwriter had voided the policy, [and one year and five months after the Puerto Rico State Court dismissed the EDB's complaint], Sealink sent a formal demand letter to Frenkel complaining of Frenkel's failure to advise Sealink as to the "meaning and purport" of MAR 91. *See* Docket No. 20, ¶ 89

On February 12, 2004 Sealink filed the instant claim requesting damages pursuant to the denied coverage and voidance of the insurance policy placed by Frenkel, and loss of business opportunities. *See* Docket No. 1, ¶¶ 21–23. An amended claim was filed on July 13, 2004 adding to the allegations that Frenkel had failed in its duties as an insurance broker. Sealink contends that Frenkel breached their contract for failure to place a proper insurance policy and properly negotiate claims on Sealink's behalf. *See* Docket No. 3, ¶ 24. The amended claim failed to include, however, a breach of contract claim. Rather, Sealink's claim for breach of contract was first alleged in the opposition to Frenkel's motion for summary judgment. *See* Docket No. 27, p. 11.

On February 15, 2006 Frenkel filed a motion for summary judgment alleging that Sealink's action was time barred by the statute of limitations applicable to tort actions; that Sealink's allegation of Frenkel's breach of fiduciary duty is without merit; and that Frenkel's alleged negligence was not the proximate cause of Sealink's injuries stemming from the voidance of its insurance policy. *See* Docket No. at pp. 26, 31 and 36.

On March 27, 2006, Sealink filed an opposition to Frenkel's motion for summary judgment. *See* Docket No. 27. Sealink contends that Frenkel failed to act with

the sufficient skill, care, and diligence required as an insurance broker. *Id.*, at p. 1. Sealink also contends that its claim is not time barred because it is within the statute of limitations applicable to tort actions or to an action for breach of contract. *Id.*, at p. 12.

On April 21, 2006, the Court referred the matter to Honorable Magistrate Judge Gustavo A. Gelpí for his R & R. *See* Docket No. 37. The Magistrate Judge filed the R & R on May 11, 2006. *See* Docket No. 40. In his report, the Magistrate Judge recommends that the motion for summary judgement be granted based on prescription of the damages claim regarding the broker's failure to comply with his duties. The Magistrate Judge found the complaint time barred based on the fact that Sealink had knowledge of any potential cause of action against the broker since the Carolina Superior Court issued its Judgment on February 11, 2003 and the instant case was not filed until July 12, 2004—clearly evidencing that the one year statute of limitation had elapsed, thus, barring the damages claims. P.R. Laws Ann. tit. 31 § 5141. The Magistrate Judge further found that the documents alleging the tolling of the statute failed to comply with the requisites for proper tolling, and merely constituted a "pleading of its case". *See* Docket No. 40, at 8–9.[4] The record is barren regarding Sealink's alleged attempt to toll the running of the statute of limitations, let alone the propriety of said attempt. Sealink filed their objection thereto on May 22, 2006 within the time period

allowed by the Court. *See* Docket No. 41. Frenkel filed a response in opposition to Sealink's objection on May 31, 2006. *See* Docket No. 42. Although the Magistrate Judge dismissed the complaint as time barred, the Court prefers to dismiss the claim on the merits holding that the broker did not have the duty to correct facts that constituted material misrepresentations that were provided by the insured. The Court examined the parties' motions and the R & R, and now proceeds to make a *de novo* review.

## IV

### INSURANCE BROKER DUTIES UNDER MARINE INSURANCE

The contract of marine insurance is a contract whereby the insurer undertakes to indemnify the assured, in the manner and to the extent thereby agreed, against the losses incident to the marine adventure. See 2 Thomas J. Shoenbaum, *Admiralty and Maritime Law*, § 19–1 (4th ed.2004). There are three principal categories of marine insurance policies: H & M insurance; cargo insurance; and protection and indemnity insurance. The hull insurance is taken by the shipowner to insure the vessel and its equipment on a time basis and certain liabilities for collision as well as general average and salvage charges. A hull policy on a commercial vessel typically insures against physical damage and losses from certain perils. *Id.*, at § 19–10.

---

4. Art. 1873 governs the extrajudicial interruption of the limitations period. *Tokyo Marine and Fire Ins. v. Perez & Cia.*, 142 F.3d 1, 4 (1st cir.1998). An extrajudicial claim effectively tolling the statute of limitations restarts the prescriptive period on the date the extrajudicial claim is made. *Id.* In order to effectively toll the statute of limitations, however, said extrajudicial claim has to be made before the statute of limitations expires, the same must

be made by the holder of the right to the action whose limitation period is sought to be tolled (addressed to the potential passive figure causing the violation), the means employed to make the claim must be adequate, and there should be identity between the right claimed and the right affected by the *statute* of limitations. *See also Díaz De Diana v. A.J.A.S. Ins. Co.*, 110 P.R. Dec 471, 476 (1980).

■ The basic substantive law of marine insurance contract is federal maritime law. District courts have original jurisdiction in admiralty matters, as conferred in 28 U.S.C.A. § 1333(1), stating that "[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of (1)[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled [ ... ]". However, a federal district court sitting in admiralty applies state law to disputes over contracts of marine insurance. *See Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 320–21, 75 S.Ct. 368, 99 L.Ed. 337 (1955). Specifically, when neither party claims that a federal statute or rule of maritime law governs the current situation, courts must look to state law to resolve the issues. *Id.* Although, the *Wilburn Boat* doctrine was applied by certain courts to contracts to procure maritime insurance and disputes arising from the relationship between the insurance broker and the assured, *Graham v. Milky Way Barge, Inc.*, 923 F.2d 1100, 1105 (5th Cir.1991); *Illinois Constructors Corp. v. Morency & Assoc., Inc.*, 802 F.Supp. 185, 187 (N.D.Ill.1992), the Supreme Court of the United States concluded that Courts must determine the boundaries of admiralty jurisdiction looking at the purpose of the relationship or transaction at hand. *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 608, 111 S.Ct. 2071, 114 L.Ed.2d 649 (1991). Justice Marshall further stressed that the admiralty jurisdiction is designed to protect maritime commerce and mandates lower courts to look at the nature and subject matter of the relationship in controversy to assess if the admiralty jurisdiction stands. *Id.*, at 612.

Since issuance of said mandate, only two district courts have had to discern whether the procurement contract before them were related to maritime commerce to such an extent as to warrant their falling within those court's admiralty jurisdiction. *See Lewco Corp. v. One 1984 23' Chris Craft Motor Vessel*, 889 F.Supp. 1114, 1995 A.M.C. 2994 (D.Minn.1995); *Illinois Constructors Corp. v. Morency & Associates, Inc.*, 794 F.Supp. 841, 1993 A.M.C. 203 (N.D.Ill.1992). In *Illinois Constructors* the Northern District Court of Illinois held tat the agreement to procure maritime insurance did in fact fall within the Court's admiralty jurisdiction for it was the broker who failed to secure insurance which contains pollution coverage—coverage integral to the maritime activities of the vessel *in lieu* of the devastation to maritime commerce resulting engendered by accidents at sea and the overwhelming costs of clean-up. *Id.* at 843. The *Illinois Constructors* Court, however, did not reach this conclusion without first emphasizing that, when analyzing the subject matter of the agreement to procure maritime insurance and the relationship between the parties with a view **toward protection of maritime commerce,** courts must be "cautious to open the courthouse doors to a surge of litigation concerning transactions that may only tangentially involve a maritime business or ship owner merely because one is a party in the dispute." *Id.* The *Lewco Corp.* Court sheds further light onto this subject. Particularly, *Lewco Corp.*, Citing to Charles L. Black, Jr., *Admiralty Jurisdiction: Critique and Suggestions*, 50 Col.L.Rev. 259, 264, specified that "[m]aritime insurance, yes [falls within the admiralty jurisdiction]; a contract to procure it, no [falls outside admiralty jurisdiction]." *Lewco Corp.*, 889 F.Supp. at 1116.

■ Understanding that the contract object of the instant complaint is one to **procure** maritime insurance and the duties of the broker thereto, and concluding that the subject matter of the maritime insurance brokered to be procured does not

involve a maritime business or affects maritime commerce, the Court chooses to be cautious and closes the courthouse doors to this suit in admiralty for the parties' controversy regarding the interpretation and/or duties of the procurement contract falls **only** within state insurance law and interpretative case law. Notwithstanding, because there is clear diversity between the parties, the Court proceeds to address the issues on the merits while applying exclusively state law.

■ The parties to a contract of insurance are generally the assured and the insurer or underwriter. Often times, due to the specialized nature of the insurance industry, an insurance broker is consulted as an intermediary between assured and insurer. An insurance broker, according to Article 9.020 of the Puerto Rico Insurance Code, "is an individual, firm or corporation who for compensation as an independent contractor, in any manner solicits, negotiates, or procures insurance or the renewal or continuance thereof, on behalf of insureds or prospective insured other than himself, and not on behalf of an insurer or agent". P.R. Laws Ann. tit. 26 § 902. The role of the insurance broker can vary depending on the circumstances of their actions and on whose behalf the broker acts—they can be considered agents of the assured when they procure an insurance contract from various insurers; or they can be considered agents of the insurer when they receive and transmit payments for the policies issued. 3 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* §§ 45:1–45:10 (1997); *see also Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 320–21, 75 S.Ct. 368, 99 L.Ed. 337 (1955); *Graham v. Milky Way Barge, Inc.*, 923 F.2d 1100, 1105 (5th Cir.1991).

As an agent to the assured, the insurance broker has the following duties: (1) to carry out the assured's instructions; (2) to exercise reasonable care in carrying out his duties; (3) to avoid conflicts of interest with respect to his client as part of his fiduciary duties; and (4) payment and return of the premium. *See* Shoenbaum, *supra*, at § 19-5.

The duty to carry out the assured's instructions relate to the broker's approach of suitable underwriters, and to use his best efforts to obtain suitable coverage within a reasonable time. He is also responsible for disclosing to an insurer material facts concerning the risk. However, the broker will not be liable if the assured's instructions are incomplete or ambiguous. In order to exercise reasonable care, the broker must select responsible insurers and apply their specialist knowledge while still carrying out the assured's instructions. As mentioned above, an insurance broker may also be called to protect the fiduciary relationship with the assured and, thus, must avoid conflicts of interest with other parties to the insurance contract. An exception to avoiding conflicts of interest is, for example, when brokers disclose and have consent from the parties involved. In general, brokers acquire express and fully informed consent to the assureds and insurers so they can act on behalf of both parties. Brokers are directly responsible to the insurer for premium payments received by the assured upon issuance of the insurance contract. They are also directly responsible to the assured to pay the losses covered in the insurance policy and for the return of the unused portion of the premium upon policy cancellation. *See* Russ & Segalla, *supra*, at §§ 45:1–45:10.

■ Specifically, the Supreme Court of Puerto Rico has addressed the issue of whether the insurance broker is responsible to the assured when the insurer denies coverage. In *González v. The Commonwealth Ins. Co.*, 140 P.R. Dec. 673, 691

(1996), the Supreme Court of Puerto Rico held that between the insurance broker and the assured exists an agency relationship to procure insurance. As such, applying Article 1610 of the Civil Code of Puerto Rico, P.R. Laws Ann. tit. 31, § 4442, if the broker carries out the instructions given by the assured, the insurance broker cannot be held responsible for the result of those actions. The same is true in the absence of such instructions when the broker acts according to the character of the business.

Under a marine insurance contract, as for any other insurance contract, the duties of the assureds are to pay the insurance policy premium; notify the insurer or broker of any claims covered by the insurance policy in a timely manner; and make truthful and complete representations on the insurance application of material matters. The insurance industry considers material matters to be the information that would aid the underwriters in making their determination of assuming the risk and, if choosing to assume the risk, decide the premium to be charged. The query the Court must now address is, under a broker-assured relationship, whose responsibility is it to properly fill out the insurance application and ensure the accuracy and completeness of the information contained therein. From the text of the Insurance Code of Puerto Rico, the Civil Code of Puerto Rico, and interpretations of the Supreme Court of Puerto Rico, the Court can only conclude that **it is the sole responsibility of the assured to complete the insurance application and ensure its accuracy.**

■ The insurance industry, in general, requires of the parties involved in an insurance contract the utmost good faith on all aspects of their relationship. Often, the insurer, agent, or broker lacks the means for verifying the accuracy or completeness of the information provided by the insur-ance applicants for purposes of their risk analyses. Consequently, the doctrine of *uberrimae fidei:*

> "puts the burden on the assured to 'disclose to the insurer all known circumstances that materially affect the risk being insured'-whether or not the insurer asks about them—on the theory that '[s]ince the assured is in the best position to know of any circumstances material to the risk, he must reveal those facts to the underwriter, rather than wait for the underwriter to inquire' *(Citations omitted)*. The assured's failure to make such disclosure entitles the underwriter to void the policy *ab initio.*"

*Commercial Union Ins. Co. v. Flagship Marine Services, Inc.,* 982 F.Supp. 310, 313 (S.D.N.Y.,1997).

In marine insurance, contrary to other kinds of insurance, "a mistake or omission material to a marine risk, whether it be willful or accidental, fraudulent or resulting from a mistake, negligence, or voluntary ignorance, **avoids the policy**". *See* Russ & Segalla, *supra*, at § 99:6 (emphasis added). The reason the policy is void under these circumstances is that the risk assumed is not the one intended to be assumed by the insurer.

The Supreme Court of Puerto Rico has implemented the principle of utmost good faith when resolving cases related to breach of insurance contracts or of the duties of any of the parties. In *Serrano Ramírez v. Clínica Perea, Inc.,* 108 P.R. Dec. 477 (1979), the Court upheld the avoidance for coverage of an insurance policy when, in the course of a medical malpractice suit against the assured, the insurer learned the assured had omitted certain material information from the insurance application that if the insurer had known, would have not issued the policy. The Court stressed the importance of acting in utmost good faith in insurance con-

tracts based on the nature of the insurance industry, the risks involved in it, and also because the end result is the rescission of the contract for vitiated consent.

Most recently, in *Rivera Labarca v. PRAICO*, 2006 PRSC 26, the Court, again, stressed the requirement of utmost good faith in insurance contracts in the negotiations conducive to perfecting the contract, as well as in the completion of the contract. In this case, the assured purchased an automobile insurance and did not disclose the manner in which the title to the vehicle was acquired or the actual storage place for the vehicle. After a few months, the vehicle went over a cliff due to a mechanical malfunction which resulted in costly repair of the damages. The assured claimed coverage under the insurance policy, but, while investigating the claim, the insurer learned of the omissions in the application. The insurer denied coverage and rescinded the insurance contract arguing that the omissions were material to assuming the risk, and that they would not have issued the insurance if they had known the manner in which the title to the vehicle was acquired. The Court dismissed the claim against the insurer and concluded that the insurer had acted appropriately in denying coverage and cancelling the insurance contract based on the lack of information that was material to assuming the risk.

The Supreme Court of Puerto Rico has also allowed an exception to the assureds' duty to make truthful and complete representations in the insurance application. When the assured truthfully has no knowledge of the information requested in the application, the assured or beneficiary, upon avoidance of coverage, may show evidence that the assured had neither knowledge of nor reason to know the information inquired in the insurance application. That was the situation in *Sandoval Figueroa v. Puerto Rican Life Ins. Co.*, 99 P.R.

Dec. 287 (1970), wherein the insurer denied payment to the beneficiaries of a life insurance policy because the assured had completed the application shortly before dying of cancer, and made no such disclosures in the application. The beneficiaries of the policy presented evidence that neither them nor the assured had prior knowledge of her condition. The Court determined the insurer had to submit payment to the beneficiaries because the principle of utmost good faith had not been breached.

Consequently, the Court must conclude from the discussion set forth that, in accordance with the principle of utmost good faith, it is the assureds' obligation to provide accurate and complete information in their insurance application. This obligation persists despite the intervention of insurance brokers or other intermediaries between the relationship of assureds and insurers. In so doing, the insurance contract could not be avoided and coverage should not be denied on grounds of misstatements or non-disclosures.

## V

## ANALYSIS

Sealink alleges they suffered a loss due to the cancellation of the policy. Sealink argues that this loss was a result of Frenkel's lack of reviewing thoroughly the insurance application for completeness and correctness, other than just ensuring it was signed. In doing so, Sealink alleges Frenkel failed to act with the sufficient skill, care, and diligence required of it as a broker, as instructed in the Insurance Code of Puerto Rico. *See* Docket No. 27, ¶ 1.

In this case there is no evidence on record that Frenkel, in acting as an insurance broker to Sealink, acted differently than any other broker would have acted under the same circumstances. Sealink alleges that Frenkel breached their fidu-

ciary duty because they only reviewed the insurance application to ensure it was signed, not to ensure its accuracy or completeness. However, there is no recognized duty of an insurance broker to review the insurance application for the truthfulness or accuracy of the information contained therein and supplied by the assured before sending it to the underwriters. On the contrary, it is the assured who carries the burden for the accuracy of the representations and disclosures included in the insurance application, subject to cancellation of the insurance policy for any material misrepresentations or omissions.

Furthermore, Sealink alleges that because they were a new client of Frenkel's by 1998, the time when the insurance application was completed, Frenkel "should have been aware that his new client would require guidance in filling out an application of insurance, where a wrong or misleading answer would result in denial of insurance". *See* Docket No. 27, ¶ 4, p. 2. In essence, Sealink is asking the Court to conclude that because they were a new customer to Frenkel, they were also new to marine insurance. However, Exhibit 1 of plaintiff's Motion for Summary Judgment, Docket No. 19, shows an executive summary in which it represents that Mr. Meszaros'[5] experience in the maritime transportation industry was of almost twenty (20) years at the time he completed the insurance application with Frenkel. Exhibit 1 further evidences that Mr. Meszaros was appointed, among other duties,

the administration and operations of the business. *Id.*, pp 1 & 8. Hence, it would be unreasonable to deem that 1998 was the first time Mr. Meszaros encountered an application for maritime insurance, thereby requiring guidance in filling out an insurance application.

This Court stresses that the instant case is not one in which the nature of the insurance is the cause of the voidance, but, instead, one in which the correct insurance policy is based on misrepresentations provided by the insured to the insurance company, thus, causing voidance. The Court simply cannot envision placing responsibility on Frenkel for Sealink's misleads as to prior material misrepresentations as to bankruptcy applications and/or detentions by the Coast Guard due to poor maintenance and/or prior structural vessel damage and/or providing true market value of the vessel and/or prior grounding of the vessel.

Based on the above, the Court cannot accept Sealink's allegation that it had no knowledge of the omissions and non-disclosures that resulted in the cancellation of its insurance policy, or that Mr. Meszaros did not know how to complete the insurance application. Along the same line, the Court cannot hold that Frenkel breached its duty as an insurance broker due to Frenkel's own lack of knowledge of the term MAR 91. The issue of fiduciary duty or providing the wrong policy had no relationship with the cancellation of Sealink's insurance policy.[6] In acting within the

---

**5.** Mr. Kristian Meszaros is Sealink's Chief Executive Officer.

**6.** The insurance policy was cancelled for the following reasons: (1) material misrepresentations on the application related to the affiliation with an entity involved in bankruptcy proceedings; (2) failure to disclose uncommonly high number of detentions by the U.S. Coastguard due to the poor maintenance and structural damage to the vessel; (3) failure to

disclose threats of physical violence made by the crew while on the Dominican Republic during a wage dispute; (4) material misrepresentation or failure to disclose the true market value of the vessel; and (5) material failure to disclose grounding and repeated instances of contact damage and casualty loss history. All of these reasons were deemed material to assuming the risk and to determine the insurance coverage. *See* Docket No. 19, pp. 17 & 37. These misrepresenta-

limits and duties of an insurance broker, Frenkel is not liable to Sealink for failing to review the insurance application for its completeness or accuracy, or for the lack of knowledge of the term MAR 91 simply because the policy was cancelled due to material misrepresentations as set forth at Note 6, *infra.*

Therefore the Court holds that Frenkel was not negligent and did not have the duty to provide facts that were the exclusive knowledge of the assured regarding the broker's obligations as Sealink's insurance broker. Accordingly, Sealink's negligence and loss of business opportunities claims are hereby DISMISSED WITH PREJUDICE.

## VI

## CONCLUSION

For the reasons stated above the Court hereby **ADOPTS IN PART**[7] the Magistrate Judge's R & R, and **GRANTS** Frenkel's Motion for Summary Judgment.[8] Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE.**

Judgment shall be entered accordingly.

IT IS SO ORDERED.

tions have not been sufficiently challenged by plaintiff.

7. The Court finds that the Magistrate Judge's R & R to grant Frenkel's Motion for Summary Judgment does not address the issue of the alleged failed duties of the broker in the issuance of the insurance contract, which is the main allegation in Sealink's claim and opposition to Frenkel's Motion for Summary Judgment. However, the Court deems that this case is not one dealing with failed duties

of the broker, but one dealing with material misrepresentations by the insured in seeking insurance coverage.

8. Defendant Frenkel argues that Sealink's claims are time-barred because they are based on torts and are subject to the one-year statute of limitations, which had long elapsed by the time the claim was filed. We need not address this issue because we hold that Frenkel is not liable to Sealink.